SOMERSWORTH SAVINGS BANK *v.* WOOSTER.

An execution debtor discharged upon giving bond, who has surrendered himself and been committed to jail, may be admitted to take the poor debtor's oath.

PETITION of the defendant to a justice of the court for the appointment of two justices under Gen. Laws, *c.* 241, *s.* 1.

In March, 1885, the defendant, being arrested on the plaintiffs' execution, was discharged upon giving bond as provided in Gen. Laws, *c.* 240, *ss.* 1, 2. Having made no application within the year for admission to take the poor debtor's oath, he surrendered himself at the end of the year, when he was arrested on the plaintiffs' alias execution, and committed to jail, where he remains.

*Copeland & Edgerly*, for the plaintiffs.

*J. S. H. Frink* and *Jeremiah Smith*, for the defendant.

CARPENTER, J. The act of February 15, 1791 (Laws of 1805, *p.* 126), provided that a person committed upon execution for

debt not founded upon a prison bond. should be kept in close confinement unless he gave a bond with sufficient sureties conditioned to remain a true prisoner in the custody of the prison keeper until he was lawfully discharged, in which case he was allowed the liberty of the yard, the limits of which could not exceed two hundred · rods each way from the jail. Whether he gave bond or not, he could at his pleasure apply for admission to take the poor debtor's oath at any time after the lapse of thirty days from the time of his commitment. A person committed upon an execution issued on a judgment founded upon a prison bond was not entitled to the liberty of the yard, but was required to be confined in close prison. He had, however, the same right as other debtors to apply at any time after thirty days for leave to take the oath. The act of January 3, 1829 (Laws of 1830, p. 476), provided that the debtor might make his application for admission to take the oath immediately upon his commitment. The act of July 2, 1831 (Laws of 1831, *c*. 30), extended the limits of each jail-yard to the line of the county in which it was situated, and provided that the imprisoned debtor should not have the liberty of the yard longer than one year; that if within that time he did not apply for and take the benefit of the poor debtor's oath, and was not otherwise lawfully discharged, the creditor might sue out a new execution and cause him to be committed thereon to close confinement, and that he should not be again admitted to the liberty of the yard. The object of limiting the privilege to one year is obvious. The limits of the yard being · coextensive with those of the county, it might happen that confinement therein would be no hardship upon the debtor, and have no tendency to induce him either to pay the debt or take the oath. One unable to take the oath and abundantly able to pay might defy his creditors so long as he was content to remain in the county. To prevent this mischief, the liberty was limited to the period of one year. But the statute, neither in terms nor by implication, deprived the debtor of his previously existing right to apply for admission to take the oath whenever after his commitment he saw fit. The act of January 3, 1833 (Laws of 1832, *c*. 107), provided that the prison bond should be conditioned not as before that the debtor should remain a true prisoner, but that he should within one year from the day of his arrest apply to the proper authority, and be admitted to take, and actually take, the oath for the relief of poor debtors, or at the end of the year surrender himself up to the creditor, and that upon giving such bond he should be discharged from imprisonment; that in case the debtor surrendered himself, the creditor might, as under the. law of· 1831, cause him to be committed on a new execution to jail, "where," in the language of the statute, " he shall remain in close confinement, and shall not again be discharged on giving bond as provided in this act." This act, like the former ones, denied the privilege of giving a prison bond to

persons who were committed on an execution founded upon such a bond, and required them to be kept in close jail; but they, like other debtors, had the right as well after the lapse of a year from the time of their commitment as at any time during the year to apply at their pleasure for leave to take the oath, and, if found qualified, to take it. Since the passage of that act no change affecting the present question has been made in the law. Rev. Stats., cc. 199, 200; Gen. Stats., cc. 221, 222; G. L., cc. 240, 241. The close confinement to which one class of debtors is subjected after a year's liberty under a prison bond, and the other class from the beginning, has no relation or reference to the privilege of applying for admission to take the poor debtor's oath, but is confinement without, in distinction from confinement with, a right to be discharged upon giving bond. There is nothing in the statute indicating an intention to place the debtor, who has given a prison bond and subsequently surrendered himself, in a worse position than one who is not entitled to give a bond. Each is to be confined in close jail until he is lawfully discharged. One method of obtaining a discharge is by paying the debt; another is by applying to the proper authority for leave to take, and actually taking, the poor debtor's oath. It might as reasonably be contended that he could not be discharged upon the performance of the former as of the latter alternative. The purpose of the statute is quite as much to relieve from useless imprisonment the honest debtor who is willing but unable to pay his debts, as it is to compel payment by him who is able.

*Petition granted.*

Doe, C. J., did not sit: the others concurred.